(No. 37237.

Bruno Sloger, Appellee, *vs.* Adam V. Sloger, Jr., *et al.,* Appellants.

*Opinion filed November 30, 1962.*

EUGENE R. PIETKIEWICZ, of Chicago, for appellants.

ZELEZINSKI and BRANDENBURG, and D. J. VARRAVETO, JR., of Chicago, (ROBERT P. BRANDENBURG, of counsel,) for appellee.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Bruno Sloger brought suit in the superior court of Cook County to set aside the will of his father, Adam Sloger, deceased, on the grounds of undue influence and lack of testamentary capacity. Trial was had before a jury, which returned a general verdict in plaintiff's favor. Defendants' motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial were denied. The defendants Adam Sloger, Jr., individually and as executor of the will, together with his wife, Vera, appeal directly to this court, a freehold being involved. They contend the verdict is against the manifest weight of the evidence.

The testator died on June 25, 1959, leaving his two sons, Bruno and Adam, Jr., as his only heirs. By his will, executed on January 17, 1957, he first provided a $6000 fund for the care and upkeep of his own and his wife's grave. Next he left $5000 in trust for his minor granddaughter, the child of Adam and Vera Sloger. Then follow legacies of $100 each to two nephews and to two named grandsons (the children of Bruno), $400 to a sister of Adam's wife, Vera, $25 "to

my step-son Bruno Sloger"; and $75 to Bruno's wife Dorothy. The balance of his estate he left to his son Adam, whom he also named executor.

It appears that the testator, a man 64 years of age, lived alone in the basement apartment of his building. He rented out vacant flats in the building to tenants, collected the rents, arranged for repairs and in general performed the duties usually associated with the management of such property. He was visited from time to time by his son Adam and Adam's wife Vera. Vera would sometimes pay his utility and telephone bills, or do his washing, ironing and cleaning for him. She also took him to the doctor when he needed medical attention, and did other errands for him. The son Adam was occasionally called upon to make repairs to the building when it became necessary.

From 1954 until his death in 1959 the testator suffered from a heart condition, high blood pressure and hypertension. About once a month during that period he visited his physician, who treated him with medications. He died after suffering a cerebral hemorrhage. While in the hospital he was found to be a diabetic.

In 1955 the testator lived at the home of his son Bruno and Bruno's wife Dorothy, but in 1956 he moved back to his apartment. When he left Bruno's house he was upset, and later complained to one of his tenants that Bruno had not treated him very well. On January 10, 1957, he expressed an intention to make a will, and requested his daughter-in-law Vera to drive him to an attorney's office. He could not speak English very well and upon arriving at the office he conversed in Lithuanian with the attorney's father, who spoke and understood that language. Since the attorney could not speak the Lithuanian language his father took notes regarding the dispositions decedent wanted to make and later turned them over to the attorney. A week later the will was ready to be signed and Vera again brought the testator to the lawyer's office. She remained in the waiting

room while the testator went into the private office with the attorney and the latter's father and executed the will.

There is no evidence whatever to show that Vera or Adam Sloger procured the will or participated in its preparation and execution. While Vera brought the decedent to the lawyer's office in her automobile when he made the arrangements for its contents and when he signed it, she was not present during the discussions and merely waited in the outer office when the will was signed. This is obviously insufficient to justify a finding of undue influence. Moreover, the plaintiff does not even argue this ground in his brief, and presumably it has been abandoned.

The only evidence to support the charge of mental incapacity consists of the provisions of the will itself, which plaintiff says discloses on its face ample grounds to support a determination that testamentary capacity was lacking. Principal reliance is placed on the fact that testator referred to his son Bruno therein as "my step-son." Also pointed to are the facts that in the gifts to Bruno's two sons they are not described or referred to as grandchildren, and that the will makes an inequitable or uneven distribution as between the two sons, Adam and his family receiving almost the entire estate whereas Bruno and his family received a total of only $300. It is argued that from these facts the jury could reasonably find the testator to have been unable to recognize the natural objects of his bounty and to have been of unsound mind.

The rules governing the present case are well settled and hardly require extended citation. . Where a person has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life he has sufficient mental capacity to dispose of his property by will. (*Quellmalz* v. *First Nat. Bank of Belleville*, 16 Ill.2d 546; *Shevlin* v. *Jackson*, 5 Ill.2d 43.) Sickness and infirmity alone do not show lack of testamentary capacity, nor does an unreasonable prejudice against a natural object of one's bounty neces-

sarily do so. (*Roller* v. *Kurtz*, 6 Ill.2d 618; *Sterling* v. *Dubin*, 6 Ill.2d 64.) To suffer such incapacity the testator, at the time he executes his will, must lack sufficient mental capacity to know the natural objects of his bounty, to comprehend the kind and character of his property, to understand the nature and effect of his act, and to make a disposition of his property according to some plan formed in his mind. *Roller* v. *Kurtz*, 6 Ill.2d 618; *Szarat* v. *Schuerr*, 371 Ill. 289.

The law presumes every man to be sane and of sound mind until the contrary is proved, and the burden rests upon the party who asserts it to prove lack of testamentary capacity. (*Shevlin* v. *Jackson*, 5 Ill.2d 43.) In the case at bar none of the witnesses testified that the testator was unable to transact ordinary business or was otherwise mentally incapacitated. On the contrary the evidence in fact shows affirmatively that he possessed the requisite capacity, and even the two disinterested witnesses called by the plaintiff expressed the opinion that he was mentally sound. Similar testimony was given, on defendants' behalf, by an attesting witness to the will, the testator's physician, a neighbor, a tenant, and his sister-in-law. The fact that the testator in his will referred to Bruno as his step-son is explained by the attorney's father, who testified that at the conference in his office, when the testator used the word "step-son" with reference to Bruno, he inquired as to the reason, and the testator replied: "Well, he treated me like a step-son. I want to leave him like a step-son. Leave it like it is."

The fact that the testator's property was divided unequally between those presumably having a claim on his bounty may be attributed to any number of reasons, either fair or unfair. That he did not treat each of his children equally in his will is no indication of his failure to recognize the natural objects of his bounty or to understand the nature of his dispositions. In the absence of some more unequivocal evidence of mental incapacity, neither the fact relied upon

nor any reasonable inference therefrom tends to establish the allegations of the complaint.

We conclude that the plaintiff failed to adduce evidence sufficient to submit to a jury the issues in the case. The decree is reversed and the cause is remanded to the superior court of Cook County with directions to enter judgment for defendants notwithstanding the verdict.

*Reversed and remanded, with directions.*